## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF OKLAHOMA

DWIGHT SULLIVAN,          )
                         )
         **Plaintiff,**         )
                         )
v.                         )     **Case No. 09-CV-325-PJC**
                         )
MICHAEL J. ASTRUE, Commissioner of the )
Social Security Administration,     )
                         )
         **Defendant.**     )

### OPINION AND ORDER

Claimant, Dwight Sullivan ("Sullivan"), pursuant to 42 U.S.C. § 405(g), requests judicial review of the decision of the Commissioner of the Social Security Administration ("Commissioner") denying Sullivan's application for disability benefits under the Social Security Act, 42 U.S.C. §§ 401 *et seq*. In accordance with 28 U.S.C. § 636(c)(1) and (3), the parties have consented to proceed before a United States Magistrate Judge. Any appeal of this order will be directly to the Tenth Circuit Court of Appeals. Sullivan appeals the decision of the Administrative Law Judge ("ALJ") and asserts that the Commissioner erred because the ALJ incorrectly determined that Sullivan was not disabled. For the reasons discussed below, the Court **REVERSES AND REMANDS** the Commissioner's decision.

### Claimant's Background

At the time of the hearing before the ALJ on December 17, 2008, Sullivan was 48 years old. (R. 100, 534). Sullivan testified that his last job was with the City of Hominy in 2004 or 2005, and he quit when he hurt his knee, it required surgery, and the doctor put him on disability. (R. 543-44). He never returned to work. (R. 544).

Sullivan testified that he had limited use of his right shoulder, with limited range of motion and pain. (R. 544-45). He described the pain when he reached out with that arm to pick up something as "pretty excruciating." (R. 545). If he sat in a recliner for 10-15 minutes, the pain would ease up. *Id.* He testified that his back hurt constantly, and the pain was in both his upper and his lower back. *Id.* He could sit for about 20 minutes before needing to move around. (R. 546). Standing for long caused pain in both his back and his knees. (R. 546-57). Walking around a small Wal-Mart store would be uncomfortable. (R. 547). Sitting in a recliner and elevating his legs would sometimes help, but not always. *Id.* He spent most of his day sitting in the recliner, although he would sometimes lie in bed. (R. 547-48). He estimated that he slept about four hours, and the interrupted sleep was due to knee and back pain. (R. 548). He would have to get up and walk around. *Id.* If he was given a task, such as stuffing envelopes or stacking light items, from a sitting position, the main problem he would have was with his right shoulder. (R. 548). He would not be able to do a task such as that for a two- or three-hour time period. *Id.*

He was prescribed Lortab for the pain, and he took it every three to four hours. (R. 548-49). It controlled the pain "somewhat." (R. 549). He was diabetic, and he took an insulin shot at bedtime. *Id.* Due to diabetic complications, he had retinopathy surgery on his left eye five times, and once on his right eye. *Id.* His eyesight wasn't as good as it had been. (R. 549-50). He drove some in Hominy where he lived, but he did not want to drive to Tulsa due to his vision and his pain. (R. 550). Sullivan testified that he did not do any of the household chores, and his wife did those things. (R. 551-52). His wife had completed the paperwork for his disability application. (R. 552).

On November 2, 2004, Sullivan had an MRI examination of his right knee, and the report indicated that the MRI was due to a "twisted" right knee. (R. 237-38). The report stated that the

results were consistent with a meniscal tear.  (R. 237).  Arthroscopic surgery to repair the tear was performed on December 9, 2004.  (R. 240-41).  In an Office Evaluation on February 17, 2005 for the workers compensation insurer, the evaluating physician stated that Sullivan did not have pain with walking or with sitting.  (R. 242-44).  Sullivan did have pain climbing stairs or squatting.  (R. 242).  The reviewing physician did not believe additional surgery would necessarily give a better result, but he did recommend continued physical therapy.  (R. 243).  He thought Sullivan should show continued improvement, but if the pain did not resolve, Sullivan might need permanent restrictions or possible job retraining.  *Id.*

On March 30, 2005, Sullivan's surgeon, Terrill Simmons, M.D., gave a workers compensation opinion, stating that Sullivan had a combined impairment of 12% to the right knee. (R. 247).  Dr. Simmons noted Sullivan's inability to squat or kneel and his difficulty with stairs, and he stated that Sullivan had restrictions in climbing, stooping, squatting, and kneeling.  *Id.*  He believed that Sullivan's condition was permanent.  *Id.*

The Administrative Transcript filed in this case contains more than 100 pages of records that appear to be from the Indian Health Center in Pawhuska (the "Pawhuska Clinic").  (R. 250-92, 362-468).  These records date from 2004 to 2008.  *Id.*  Most of these records are on pre-printed forms titled "PCC Ambulatory Encounter Record," and unfortunately the handwriting on these forms is often cryptic and/or not legible.   In addition to the records of appointments with physicians, which are summarized here, there are other records related to medication refills and checks of Sullivan's blood pressure and blood sugar.

Sullivan saw Dr. Robert Chesbro at the Pawhuska Clinic on May 4, 2005 for evaluation and management of diabetes.  (R. 264).  On August 9, 2005, Sullivan was seen at the clinic for left

shoulder and back pain that he said started when he picked up a bird bath three days earlier.  (R. 261).  The diagnosis was acute back sprain and left elbow pain.  *Id.*  He returned for a diabetes evaluation on August 31, 2005, but noted his continued back pain as well.  (R. 260).  Dr. Chesbro noted the purpose of the visit as diabetes with fair control, back pain with sciatica, increased lipids, and gastritis.  *Id.*  On November 7, 2005, Sullivan was seen at the Pawhuska Clinic for evaluation and management of back and knee pain.  (R. 467).  On February 24, 2006, the chief complaint was chronic back pain.  (R. 464).  This record includes extensive notes regarding prescribed medications, and at least one appears to indicate that the medication was for breakthrough pain.  *Id.*  On April 11, 2006, Sullivan presented for a blood pressure check, and his blood pressure was elevated at 185/101.  (R. 458).  On April 18, 2006, Sullivan was seen for a recheck of his chronic back pain, which was noted as severe, and blood pressure.  (R. 456).  The examination notes state that Sullivan also had knee discomfort, and his back was tender to the paralumbar area.  *Id.*

On April 28, 2006, Sullivan saw Dr. Chesbro, and Dr. Chesbro's notes of his examination of Sullivan's back refer both to tenderness on palpitation and to range of motion.[1]   (R. 455).

---

[1]Deciphering medical notes can be a difficult task in any context, and the undersigned has previously noted that the hand-written notes of Dr. Chesbro are particularly difficult in this regard.  The April 28, 2006 examination notes state, word for word, as follows: "Back - tender to palpitation & range of motion."  (R. 455).  His notes from a November 13, 2006 examination were more typical of his notes as Sullivan's back problems continued.  They appear to state: "Back - tender to mid back [illegible] palpitation & range of motion."  (R. 429).  Dr. Chesbro's phrasing is of significance here because he continued it on the forms expressing his opinions regarding the severity of Sullivan's impairments, which are the focus of Sullivan's appeal and this Opinion and Order.  On the November 13, 2006 form, in explaining the medical findings that supported his assessment, he wrote "Severe pain to palpitation / range of motion to back / [right] shoulder."  (R. 524).  On the December 11, 2008 form, in the same space for explanation, he wrote "pain to back to range of motion & palpitation - severe."  (R. 523).  After having reviewed all of the medical records in the Administrative Transcript before this Court, the undersigned believes that it is accurate to say that Dr. Chesbro regularly performed a physical examination of Sullivan's back and found tenderness to palpitation.  The undersigned believes that Dr.

Chronic lumbar pain was noted as the purpose of the visit, and Lortab was prescribed. *Id.* At a June 23, 2006 appointment, Dr. Chesbro characterized Sullivan's chronic back pain as marked and recurrent. (R. 448). On September 15, 2006, Sullivan saw Dr. Chesbro, complaining of marked back pain with radiating pain down his leg. (R. 435). Sullivan also stated that he was unable to lift his right arm due to pain in that shoulder. *Id.* His back pain and shoulder pain were both characterized as severe. *Id.* On that same date a form entitled PCC Annual Diabetes Foot Exam was completed by Dr. Chesbro, and it appears to indicate that there were no problems with Sullivan's feet at that time. (R. 436).

At Dr. Chesbro's referral, Sullivan saw Daniel J. Boedeker, M.D. with Neurosurgery Specialists in Stillwater, Oklahoma for evaluation on September 29, 2006. (R. 336-38). Dr. Boedeker recounted Sullivan's history of back pain with radicular symptoms in his right leg and determined that an MRI of Sullivan's lumbar spine was required for evaluation. *Id.* An MRI was performed on October 3, 2006. (R. 339). It reflected degenerative disc disease at L5/S1, and minor degenerative disc disease at T12/L1, L1/L2, and L2/L3. The reviewing physician described a grade 1 herniation of the nucleus pulposus at L5/S1 eccentric to the right. *Id.*

Sullivan saw Dr. Chesbro again on October 12, 2006 for diabetes and recurrent back pain. (R. 431). Dr. Chesbro noted the results of the MRI showing the herniation. *Id.* On November 13, 2006, Dr. Chesbro again characterized Sullivan's back pain as severe and recurrent, he described

---

Chesbro's references to "range of motion" were intended to convey that Sullivan also had pain when he tried to bend his back in the range of motion that is considered normal. In describing Dr. Chesbro's treating notes, the undersigned refers to Dr. Chesbro's findings of back pain, but frequently those findings were accompanied by notes similar to those described in this footnote, with references to palpitation and range of motion.

Sullivan's shoulder arthralgia as severe, and he noted Sullivan's insomnia and controlled diabetes. (R. 429). On December 21, 2006, Sullivan's diabetes, shoulder pain, back pain, and hypertension were noted, and Dr. Chesbro also listed GERD (gastroesophageal reflux disease) as one purpose of the visit. (R. 427).

At Dr. Chesbro's referral, Sullivan's right shoulder pain was evaluated by Gregory Holt, M.D. at the Orthopaedic Center in Tulsa on January 9, 2007. (R. 342-45). Dr. Holt noted that the physical examination showed positive impingement signs and weakness with resistance that was "quite significant." (R. 342-43). Dr. Holt also noted tenderness and decreased range of motion. (R. 343). His impressions were rotator cuff tear; shoulder joint degenerative disc disease; impingement syndrome; fibrous cortical defect of his right humerus; cervical degenerative disc disease; and cervical radiculopathy to the right side. *Id.* On January 29, 2007, Dr. Holt wrote a letter to Dr. Chesbro explaining that Sullivan's insurance would only allow an MRI of Sullivan's shoulder to be done, and the results of that MRI were normal. (R. 340). Dr. Holt's opinion was that the normal results for the shoulder made it more likely that Sullivan's difficulties came from problems in his cervical spine, and he believed an MRI of the cervical spine needed to be done. *Id.*

On February 22, 2007, Sullivan was seen at the Pawhuska Clinic for pain evaluation and management. (R. 420). Discomfort and tenderness apparently were noted when the physician examined Sullivan's back and shoulder. *Id.* The purpose of the visit was listed as severe back pain with sciatica, severe arthralgia of the shoulder, controlled diabetes, and insomnia. *Id.* A March 29, 2007 appointment reflects similar notes regarding Dr. Chesbro's examination and the purpose of the visit. (R. 418).

On May 16, 2007, Sullivan was seen for diabetic evaluation and management. (R. 415).

While Sullivan complained of swelling in his hands and feet for two weeks prior to the appointment, Dr. Chesbro noted only "slight edema" on examination. *Id.* Tenderness and range of motion were again noted for both Sullivan's lower back and his right shoulder. *Id.* The purpose of the visit was listed as uncontrolled diabetes, severe back pain, and severe shoulder arthralgia. *Id.* Sullivan was seen again for pain management on July 16, 2007, and Sullivan also complained of low energy, fatigue, trouble with his memory, and irritability. (R. 408). The purpose of visit was listed as controlled diabetes, anxiety and depression, severe degenerative joint disease, right shoulder pain, chronic back pain, and severe bilateral knee pain. *Id.* On August 27, 2007, Sullivan was seen again, but the purpose of the visit was noted as episodes of near fainting. (R. 404).

On December 31, 2007, Sullivan saw Dr. Chesbro, and the purpose of the visit was listed as diabetes, anxiety and depression, hypertension, GERD, and increased lipids. (R. 387). A foot exam done at that time  appears to show that there were no problems with Sullivan's feet. (R. 389). Sullivan was seen for pain management on February 4, 2008. (R. 384). At a March 2008 appointment for pain management, Sullivan again complained of low energy, irritability, and difficulty with sleep. (R. 379). Sullivan was seen for pain management again on April 3, 2008. (R. 520). The purpose of the visit was described as marked back pain with sciatica and severe right shoulder pain. *Id.* A May 5, 2008 visit had a similar description. (R. 516). Sullivan saw Dr. Chesbro for pain management on July 3, 2008, August 4, 2008, and September 4, 2008. (R. 501, 504, 508).

Sullivan was evaluated at the Pawnee Indian Health Center for eye-related diabetic complications on October 27, 2005. (R. 328). Records indicate that he had continued treatment and evaluations for these complications through 2008. (R. 479-84).

At Dr. Chesbro's referral, Sullivan was seen again at The Orthopaedic Center on May 28, 2008, at which time the impressions were right shoulder rotator cuff tear; cervical degenerative disc disease; lumbar degenerative disc disease; and significant thoracic pain at T4/T5 and T5/T6.  (R. 476-77).  Sullivan was referred for MRI studies, which were done on July 2, 2008.  (R. 469-72).  The reviewing physician found that the MRI of Sullivan's thoracic spine was generally unremarkable. (R. 469).  His impression from the MRI of the lumbar spine was that there were early degenerative disc changes at the lower thoracic and upper lumbar levels.  (R. 470).  The MRI showed "[p]osterior annular tearing and central disk protrusion" at the L5/S1 level "without significant deformity of the thecal sac."  *Id.*  In the body of his report, the physician stated that it was uncertain if the possible herniation at the L5/S1 level "compromises the descending right S1 root."  *Id.*  The MRI of Sullivan's cervical spine showed posterior annular tearing and disc bulging at the C5/C6 and C6/C7 levels without significant deformity of the thecal sac.  (R. 471).  The physician concluded that some mild right-sided foraminal narrowing might be present at those levels.  *Id.*  The MRI of Sullivan's right shoulder showed a rotator cuff injury.  (R. 472).

After reviewing the results of the MRI, Dr. Holt recommended a lumbar epidural steroid injection, as well as physical therapy.  (R. 475).  Sullivan saw Andrew R. Briggeman, D.O., a colleague of Dr. Holt at The Orthopaedic Center, on September 12, 2008.   (R. 528-29).  Dr. Briggeman reviewed Sullivan's history of persistent low back pain with neuralgia extending down his right leg.  (R. 528).  After physical examination, Dr. Briggeman's impressions were degenerative lumbar spondylosis with right lower extremity radiculopathy, diabetes, and lumbar myofasciitis.  *Id.* Dr. Briggeman administered a right L5/S1 transforaminal epidural steroid injection.  (R. 529).  He encouraged Sullivan to remain active on a daily basis and to continue a home exercise program.  *Id.*

Sullivan returned to Dr. Briggeman on October 10, 2008 and reported that there had been no significant change in his pain after the September injection. (R. 525). Dr. Briggeman stated that Sullivan had an antalgic gait favoring his right leg, and that there was a positive straight leg raise test on the right. *Id.* His impressions were degenerative lumbar spondylosis with right lower extremity radiculopathy with a note that there had been no relief from the epidural injection; lumbar myofasciitis; gait instability; and multijoint osteoarthritis. *Id.* Dr. Briggeman administered an injection of Toradol and a second right L5/S1 transforaminal epidural steroid injection. (R. 526). He continued his recommendation that Sullivan remain active and continue a home exercise program. *Id.*

Sullivan was evaluated by agency consultant David Wiegman, M.D. on April 14, 2007. (R. 346-52). Sullivan's chief complaints were leg pain, right shoulder pain, knee pain, and diabetes. (R. 346). On examination, Sullivan's uncorrected eye sight was 20/40 in the right eye and 20/160 in the left eye. (R. 347). Dr. Wiegman found Sullivan's arm and leg strength to be normal, and his grip strength in his right hand was slightly less than the normal strength level in his left hand. *Id.* Dr. Wiegman noted pain and decreased range of motion for all movement of Sullivan's lower and mid back. *Id.* His neck had normal range of motion with no significant pain. *Id.* He had decreased range of motion in his right shoulder. *Id.* Dr. Wiegman found Sullivan's gait to be steady, and he noted that Sullivan had trouble walking on his heels and toes separately, but could walk heel-to-toe. (R. 348). For his impressions, Dr. Wiegman first noted Sullivan's back pain, stating that it was causing Sullivan problems with walking, standing, and lifting. *Id.* His second item was Sullivan's knee pain, and he noted that it was also causing him problems with walking, standing, and lifting. *Id.* Dr. Wiegman's remaining impressions were right shoulder pain, diabetes, and hypertension. *Id.*

Agency non-examining consultant Janet G. Rodgers, M.D. completed a Physical Residual Functional Capacity Assessment on May 29, 2007.  (R. 353-60).  Dr. Rodgers found Sullivan's exertional capacity to be consistent with light work. (R. 354).  For her explanation, she summarized Dr. Wiegman's report.  *Id.*  For postural limitations, Dr. Rodgers found that Sullivan could only occasionally climb, balance, stoop, kneel, crouch, or crawl. (R. 355).  She found no other significant limitations.  (R. 356-60).

Dr. Chesbro completed a form entitled Medical Source Opinion of Residual Functional Capacity on November 13, 2006.  (R. 524).  The form defined the term "infrequently" as 0-1 hours, "occasionally" as 2-3 hours, "frequently" as 4-5 hours, and "continuously" as 6-8 hours, and all of these were for activities performed within an 8-hour workday.  *Id.*  Dr. Chesbro checked spaces indicating that Sullivan could occasionally sit and infrequently stand or walk.  *Id.*  He indicated that Sullivan could frequently lift or carry less than 10 pounds.  *Id.*  His opinion was that Sullivan could use his left arm for reaching pushing and pulling continuously, but could only use his right arm for those activities infrequently.  *Id.*  Dr. Chesbro found no limitation in Sullivan's use of his hands for grasping, handling, fingering, or feeling.  He stated that Sullivan needed to rest due to pain.  In explaining what medical findings supported his assessment, Dr. Chesbro referenced Sullivan's pain in his right shoulder upon palpitation, and he noted that Sullivan's range of motion was very limited. *Id.*  He also referenced Sullivan's back pain, which he characterized as severe, and he again made notations regarding palpitation and range of motion.  *Id.*

Dr. Chesbro completed a second form entitled Medical Source Opinion of Residual Functional Capacity on December 11, 2008.  (R. 523).  The 2006 and 2008 forms were not identical, and the 2008 form defined the term "infrequent" as less than 2 hours, "occasional" as 2-3 hours,

"frequent" as 4-5 hours, and "continuous" as at least 6 hour.  *Id.*  Again these definitions were for activities performed within an 8-hour workday.  On the 2008 form, Dr. Chesbro indicated that Sullivan could occasionally stand or walk.  *Id.*  He again stated that Sullivan could lift or carry less than 10 pounds.  *Id.*  For the medical findings that supported his assessment, Dr. Chesbro referred to Sullivan's history of degenerative disc disease of the lumbar spine.  *Id.*  He noted Sullivan's severe pain of his back and right shoulder, again with references to palpitation and range of motion.  *Id.*  He also noted Sullivan's right-sided sciatica.  *Id.*

### Procedural History

On January 19, 2007, Sullivan protectively filed applications seeking disability insurance benefits and supplemental security income under Title II and Title XVI, 42 U.S.C. §§ 401 *et seq.*, alleging disability beginning October 28, 2004.  (R. 100-02).[2]  The applications were denied initially and on reconsideration.  (R.75-79, 81-83).  A hearing before ALJ Deborah L. Rose was held December 17, 2008 in Tulsa, Oklahoma.  (R. 534-60).  By decision dated February 4, 2009, the ALJ found that Sullivan was not disabled at any time through the date of the decision.  (R. 11-20).  On April 15, 2009, the Appeals Council denied review of the ALJ's findings.  (R. 3-5).  Thus, the decision of the ALJ represents the Commissioner's final decision for purposes of further appeal.  20 C.F.R. § 404.981, § 416.1481.

### Social Security Law and Standard of Review

Disability under the Social Security Act is defined as the "inability to engage in any

---

[2]The undersigned could not locate the Social Security forms related to an application for supplemental security income benefits in the Administrative Transcript before the Court, but the ALJ notes the application in her decision.  (R. 11).

substantial gainful activity by reason of any medically determinable physical or mental impairment."

42 U.S.C. § 423(d)(1)(A).   A claimant is disabled under the Act only if his "physical or mental

impairment or impairments are of such severity that he is not only unable to do his previous work

but cannot, considering his age, education, and work experience, engage in any other kind of

substantial gainful work in the national economy." 42 U.S.C. § 423(d)(2)(A).   Social Security

regulations implement a five-step sequential process to evaluate a disability claim.   20 C.F.R. §

404.1520.[3]   *See also Williams v. Bowen*, 844 F.2d 748, 750 (10th Cir. 1988) (detailing steps).   "If

a determination can be made at any of the steps that a claimant is or is not disabled, evaluation under

a subsequent step is not necessary."  *Williams*, 844 F.2d at 750.

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. §

405(g).   This Court's review is limited to two inquiries: first, whether the decision was supported

by substantial evidence; and, second, whether the correct legal standards were applied.  *Hamlin v.*

*Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004) (quotation omitted).

---

[3]Step One requires the claimant to establish that he is not engaged in substantial gainful activity, as defined by 20 C.F.R. § 404.1510.  Step Two requires that the claimant establish that he has a medically severe impairment or combination of impairments that significantly limit his ability to do basic work activities.  *See* 20 C.F.R. § 404.1520(c).  If the claimant is engaged in substantial gainful activity (Step One) or if the claimant's impairment is not medically severe (Step Two), disability benefits are denied.  At Step Three, the claimant's impairment is compared with certain impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App.1 ("Listings").  A claimant suffering from a listed impairment or impairments "medically equivalent" to a listed impairment is determined to be disabled without further inquiry.  If not, the evaluation proceeds to Step Four, where the claimant must establish that he does not retain the residual functional capacity ("RFC") to perform his past relevant work.  If the claimant's Step Four burden is met, the burden shifts to the Commissioner to establish at Step Five that work exists in significant numbers in the national economy which the claimant, taking into account his age, education, work experience, and RFC, can perform.  *See Dikeman v. Halter*, 245 F.3d 1182, 1184 (10th Cir. 2001).  Disability benefits are denied if the Commissioner shows that the impairment which precluded the performance of past relevant work does not preclude alternative work. 20 C.F.R. § 404.1520.

Substantial evidence is such evidence as a reasonable mind might accept as adequate to support a conclusion. *Id.* The court's review is based on the record taken as a whole, and the court will "meticulously examine the record in order to determine if the evidence supporting the agency's decision is substantial, taking 'into account whatever in the record fairly detracts from its weight.'" *Id., quoting Washington v. Shalala*, 37 F.3d 1437, 1439 (10th Cir. 1994). The court "may neither reweigh the evidence nor substitute" its discretion for that of the Commissioner. *Hamlin,* 365 F.3d at 1214 (quotation omitted).

### Decision of the Administrative Law Judge

The ALJ found that Sullivan met insured status requirements through December 31, 2009. (R. 13). While in his applications, Sullivan had alleged an onset date of October 28, 2004, at the hearing before the ALJ, the onset date was amended to March 23, 2006, which was one day after a previous application was denied. (R. 11, 538). At Step One, the ALJ found that Sullivan had not engaged in any substantial gainful activity since October 28, 2004. *Id.* At Step Two, the ALJ found that Sullivan had severe impairments of degenerative disc disease of cervical and lumbar spine; right rotator cuff tear; diabetes with retinopathy; and degenerative joint disease of knees. *Id.* At Step Three, the ALJ found that Sullivan's impairments did not meet a Listing. (R. 14).

The ALJ determined that Sullivan had the RFC to do light work "except [Sullivan] can only occasionally climb, balance, bend, stoop, kneel, crouch and crawl, and only [occasionally][4] handle,

---

[4]In his brief, the Commissioner concedes that the ALJ omitted the word "occasionally" in stating her RFC determination in her decision. *See* Social Security Response Brief, Dkt. #23, p.3. The ALJ's less than precise phrasing does not appear to be part of Sullivan's appeal, Sullivan seems to agree that the ALJ's intent was that his reaching was limited to occasional reaching, and the omission of the ALJ does not affect the Court's reasoning in reversing the ALJ's decision.

reach and work above shoulder level with his right upper extremity." *Id.* At Step Four, the ALJ found that Sullivan could perform past relevant work as a security guard and as a service station attendant. (R. 19). Therefore, the ALJ found that Sullivan was not disabled at any time from the amended onset date of March 23, 2006 through the date of her decision. (R. 20).

### Review

While Sullivan raises numerous issues on appeal, the Court finds that the ALJ's decision must be reversed because it did not sufficiently address the opinion evidence of Sullivan's treating physician, Dr. Chesbro. Because reversal is required based on this issue, the other issues Sullivan raises on appeal are not addressed.

Regarding opinion evidence, generally the opinion of a treating physician is given more weight than that of an examining consultant, and the opinion of a nonexamining consultant is given the least weight. *Robinson v. Barnhart*, 366 F.3d 1078, 1084 (10th Cir. 2004). A treating physician opinion must be given controlling weight if it is supported by "medically acceptable clinical and laboratory diagnostic techniques," and it is not inconsistent with other substantial evidence in the record. *Hamlin*, 365 F.3d at 1215. *See also* 20 C.F.R. § 404.1527(d)(2). Even if the opinion of a treating physician is not entitled to controlling weight, it is still entitled to deference and must be weighed using the appropriate factors set out in Section 404.1527. *Langley v. Barnhart*, 373 F.3d 1116, 1119 (10th Cir. 2004). The ALJ is required to give specific reasons for the weight he assigns to a treating physician opinion, and if he rejects the opinion completely, then he must give specific legitimate reasons for that rejection. *Id.* When a treating physician's opinion is inconsistent with other medical evidence, it is the job of the ALJ to examine the other medical reports to see if they outweigh the treating physician's report, not the other way around. *Hamlin*, 365 F.3d at 1215

14

(quotation omitted).

Here, the ALJ included an accurate summary of the two opinion forms completed by Dr. Chesbro when she reviewed the medical evidence in her decision.  (R. 18).  Later in her decision, she stated that she had carefully considered the opinion evidence of Dr. Rodgers, the nonexamining agency consultant, "with" Dr. Chesbro's opinion evidence.  (R. 19).  The implication of the ALJ's phrasing is that she started her analysis with the evidence of the agency consultant and then considered whether it was outweighed by the treating physician evidence.  If, indeed, this was the ALJ's manner of analyzing the opinion evidence, it was clearly contrary to the law here in this circuit, in which the Tenth Circuit has said that the ALJ must start her analysis with the treating physician's report.  *Hamlin*, 365 F.3d at 1215.

After this introductory statement, the ALJ next stated that the 2006 form completed by Dr. Chesbro indicated that Sullivan could stand or walk for less than 2 hours, while the 2008 form indicated he could do so for 2-3 hours.  (R. 19).  The undersigned first comments that reasons given by an ALJ for rejecting a treating physician opinion must be "sufficiently specific to enable [the court] to meaningfully review his findings."  *Langley*, 373 F.3d at 1122-23.  Here, the ALJ did not clearly state that one of her reasons for discounting the opinion of Dr. Chesbro was because he checked a box for 0-1 hours in 2006 and then checked a box for 2-3 hours in 2008.  However, assuming that the ALJ was relying upon this inconsistency as one reason for rejecting, or discounting, Dr. Chesbro's opinions, the undersigned finds that it is legally insufficient.  The difference between the category of 0-1 hours and the category of 2-3 hours is simply not a significant enough one to show a degree of inconsistency that would undermine a treating physician opinion. *See, e.g., Garcia v. Barnhart*, 188 Fed. Appx. 760, 764 (10th Cir. 2006) (unpublished) (minor

differences in how treating physician described the claimant's ability to sit were not inconsistencies that undermined his opinion); *Moore v. Barnhart*, 114 Fed. Appx. 983, 993 (10th Cir. 2004) (unpublished) (reviewing court disagreed with ALJ's characterization of treating physician's reports as "contradictory" when the purposes of the reports were not the same).

Next, the ALJ stated:

> Dr. Chesbro lists claimant's pain and decreased range of motion as basis [sic] for these opinions; however, Dr. Chesbro's progress notes show no other neurological abnormalities such as decreased sensation, motor weakness, reflex loss, etc., that would support his opinion about the claimant being so limited, particularly in his statement that he can only sit for 2 to 3 hours a day.

(R. 19).  The ALJ's logic in this statement is that pain and decreased range of motion can never be sufficient to limit a person to sitting only 2-3 hours a day.  Even though Dr. Chesbro repeatedly examined Sullivan's back 2005 through 2008 and consistently made findings regarding pain, tenderness to palpitation, and range of motion, the ALJ would impose an additional requirement of "neurological abnormalities."  There is no such requirement in Social Security disability law.  *See Garcia*, 188 Fed. Appx. at 764 (ALJ's citation to the claimant's normal sensory function in his foot did not undermine the opinion evidence of the treating physician based on disc herniation).

Next, the ALJ stated that Dr. Chesbro's opinion was that Sullivan could only reach, push, or pull for an hour or less a day, while he could grasp, handle, finger, and feel for 6-8 hours a day. (R. 19).  Again, the ALJ's criticism based on these two parts of Dr. Chesbro's opinion evidence is implied rather than overtly stated, but apparently the ALJ believes that these statements are contradictory.  This Court, however, does not find them contradictory.  Dr. Chesbro's evidence regarding reaching, pushing, and pulling was obviously based on Sullivan's issues with his right shoulder, because Dr. Chesbro limited his opinion about severely restricted ability to the right arm,

and he said that Sullivan could use his left arm for those activities continuously (meaning 6-8 hours in an 8-hour day).  (R. 524).  Dr. Chesbro's treating notes are filled with repeated references to the severe pain and restricted range of motion that Sullivan had in his right shoulder, but the undersigned's review of those treating records did not reveal any references to problems with his hands.   The ALJ's implied finding that these two parts of Dr. Chesbro's opinion evidence were inconsistent is not supported by substantial evidence and was not a specific legitimate reason for rejecting or discounting Dr. Chesbro's opinion evidence.

Finally, the ALJ included a paragraph regarding Sullivan's right shoulder, noting that the July 2008 MRI documented a right rotator cuff tear.  (R. 19).  The ALJ found that this condition "could very likely be repaired with surgery and would not be likely to remain severe for 12 months."  *Id.* In her next sentence, the ALJ stated that "[g]iven all these factors, I give little weight to the opinions of Dr. Chesbro." *Id.*  The undersigned finds that the ALJ's reasoning regarding the possible future treatment of Sullivan's rotator cuff injury is speculation on her part, and thus not a legitimate basis for discounting or rejecting a treating physician opinion.  *Robinson*, 366 F.3d at 1082-84 (the ALJ's finding that the claimant was not compliant with prescribed medications was "speculative lay opinion" that was an improper basis for rejection of a treating physician opinion).

Thus, none of the reasons given by the ALJ in her decision are sufficient to justify a rejection or discounted weighting of Dr. Chesbro's opinion evidence regarding Sullivan.  This case must be remanded so that the ALJ can properly consider the opinion evidence of Dr. Chesbro.

The undersigned emphasizes that "[n]o particular result" is dictated on remand.  *Thompson v. Sullivan*, 987 F.2d 1482, 1492-93 (10th Cir. 1993).  This case is remanded only to assure that the correct legal standards are invoked in reaching a decision based on the facts of the case.  *Angel v.*

*Barnhart*, 329 F.3d 1208, 1213-14 (10th Cir. 2003), *citing Huston v. Bowen*, 838 F.2d 1125, 1132 (10th Cir. 1988).

Because the error of the ALJ related to the treating physician opinion evidence requires reversal, the undersigned does not address the remaining contentions of Sullivan.  On remand, the Commissioner should ensure that any new decision sufficiently addresses all issues raised by Sullivan.

**Conclusion**

Based upon the foregoing, the Court **REVERSES AND REMANDS**  the decision of the Commissioner denying disability benefits to Claimant for further proceedings consistent with this Order.

Dated this 8th day of September, 2010

Paul J. Cleary
United States Magistrate Judge